## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **MELANIE DEMPSEY ADAMS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:17-cv-01102-MHH** |
| | } | |
| **NANCY BERRYHILL,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. § 405(g), plaintiff Melanie Dempsey Adams seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Adams's claim for a period of disability and disability insurance benefits.  After careful review, the Court affirms the Commissioner's decision.

## I.  PROCEDURAL HISTORY

In June of 2014, Ms. Adams applied for a period of disability and disability insurance benefits.  (Doc. 6-3, p. 20; Doc. 6-6, p. 2).  Ms. Adams alleges her disability began on September 17, 2013.  (Doc. 6-6, p. 2).  The Commissioner

denied Ms. Adams's claim on August 7, 2014.  (Doc. 6-3, p. 20; Doc. 6-4, pp. 30-31).

Ms. Adams requested a hearing before an Administrative Law Judge (ALJ). (Doc. 6-5, p. 16).  The hearing took place on May 12, 2016.  (Doc. 6-3, p. 42).  The ALJ issued an unfavorable decision on July 13, 2016.  (Doc. 6-3, p. 17).  On May 12, 2017, the Appeals Council declined Ms. Adams's request for review (Doc. 6-3, p. 2), making the Commissioner's decision final for this Court's judicial review. *See* 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment

for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven disability, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Adams has not engaged in substantial gainful activity since September 17, 2013, the alleged onset date. (Doc. 6-3, p. 22). The ALJ determined that Ms. Adams suffers from the following severe impairments: obsessive compulsive disorder (OCD); attention-deficit hyperactivity disorder (ADHD); major depressive disorder, recurrent, moderate with anxiety; and status-post right knee total arthroplasty. (Doc. 6-3, p. 23). The ALJ determined that Ms. Adams suffers from the following non-severe impairments: diabetes mellitus, hypertension, and gastroesophageal reflux disease (GERD). (Doc. 6-3, p. 23). Based on a review of the medical evidence, the ALJ concluded that Ms. Adams does not have an impairment or a combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 25).

In light of Ms. Adams's impairments, the ALJ evaluated her residual functional capacity. The ALJ determined that through her date last insured, Ms. Adams had the RFC to perform:

> medium work as defined in 20 CFR 404.1567(c) with additional limitations. Specifically, the claimant was able to frequently use right foot controls and frequently climb ramps and stairs but never climb ladders or scaffolds. The claimant could have frequently stooped but c[ould] only occasionally crouched, kneeled and crawled. The claimant should never have been exposed to unprotected heights, dangerous machinery, dangerous tools, hazardous processes or operated commercial motor vehicles. The undersigned further finds

4

that the claimant could have done routine and repetitive tasks and she would have been limited to making simple work-related decisions. She would have been able to accept constructive non-confrontational criticism, could work[] in small group settings and have been able to accept changes in the work place setting if introduced gradually and infrequently. The claimant would have been unable to perform assembly line work with production rate pace but could have performed other goal-oriented work. In addition to normal workday breaks, she would have been off-task 5 percent of an 8-hour workday (non-consecutive minutes).

(Doc. 6-3, p. 28).

Based on this RFC, the ALJ concluded that through the date last insured, Ms. Adams could not perform her past relevant work as an English teacher, a driver's education instructor, or a recruiter. (Doc. 6-3, p. 34). Relying on testimony from a vocational expert, the ALJ found that other jobs existed in the national economy that Ms. Adams could have performed, including auto detailer, bagger, and hospital cleaner. (Doc. 6-3, pp. 35-36). Accordingly, the ALJ determined that Ms. Adams was not under a disability within the meaning of the Social Security Act at any time from September 17, 2013, the alleged onset date, through June 30, 2014, the date last insured. (Doc. 6-3, p. 36).

## IV.  ANALYSIS

Ms. Adams appeals the ALJ's decision for two reasons. Ms. Adams maintains that the ALJ improperly evaluated her credibility under the Eleventh Circuit pain standard, and Ms. Adams challenges the ALJ's evaluation of the medical opinion evidence pertaining to her mental functioning. After considering

the parties' arguments and examining the record, the Court finds that substantial evidence in the record supports the ALJ's decision.

## A. Substantial evidence supports the ALJ's credibility finding.

The ALJ's credibility determination is based on substantial evidence. The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). To establish disability based on testimony regarding pain and other symptoms, a claimant "must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart,* 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citing *Hale v Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the ALJ discredits a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson,* 284 F.3d at 1225.

Social Security Regulation 16-3p governs an ALJ's credibility determination. That regulation provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Additionally, "[w]hen evaluating a claimant's subjective symptoms," an ALJ must consider the following factors:

> (i) the claimant's 'daily activities; (ii) the location, duration, frequency, and intensity of the [claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the [claimant took] to alleviate pain or other symptoms; (v) treatment, other than medication, [the claimant] received for relief . . . of pain or other symptoms; and (vi) any measures the claimant personally used to relieve pain or other symptoms.'

*Leiter v. Comm'r of SSA*, 377 Fed. Appx. 944, 947 (11th Cir. 2010) (quoting 20 C.F.R. § 404.1529(c)(3)).

Ms. Adams testified that she cannot "get anywhere on time" due to her OCD. (Doc. 6-4, p. 20; Doc. 6-7, p. 54). Ms. Adams stated that she feels compelled to do certain things before leaving the house each day. (Doc. 6-3, p. 55; Doc. 6-4, p. 20). Specifically, Ms. Adams picks at the "sores" on her face every

day for approximately 30 minutes to three hours. (Doc. 6-7, p. 57). Ms. Adams also uses tweezers to "dig" at hairs "embedded" in her face. (Doc. 6-3, p. 64). As a result, Ms. Adams has continual, painful sores on her face that will not heal. (Doc. 6-7, p. 57). Ms. Adams characterizes her actions as a form of "self-harm." (Doc. 6-3, p. 65). Although she realizes her behavior is irrational, Ms. Adams is unable to control this compulsion and sometimes stays awake until four o'clock in the morning picking at her face. (Doc. 6-11, p. 66). Additionally, the open sores on Ms. Adams's face sometimes become infected and make her embarrassed to go out in public. (Doc. 6-3, p. 55).

Ms. Adams indicated in her functional report that she has received "[m]any speeding tickets" due to her "time problems." (Doc. 6-7, p. 62). Ms. Adams also reported that her inability to arrive on time resulted in her being fired from two substitute teaching jobs. (Doc. 6-7, p. 62). Although Ms. Adams occasionally attends church, "[i]t's usually almost over before she can get there." (Doc. 6-7, p. 51). According to Ms. Adams's attorney, her conditions caused her to be late to her administrative hearing. (Doc. 6-3, p. 46).

Ms. Adams's sister wrote that Ms. Adams "becomes very stressed and even breaks down in tears at times because of her inability to leave on time . . . ." (Doc. 6-7, p. 54). Ms. Adams's condition causes her to procrastinate completing necessary tasks like paying bills. (Doc. 6-7, p. 60). The Commissioner denied Ms.

Adams's initial application for disability because she "failed to return her forms in a timely manner." (Doc. 6-4, p. 12). Ms. Adams testified that she has a hard time starting or completing tasks due to her "lack of concentration and procrastination." (Doc. 6-7, p. 61).

The ALJ concluded that Ms. Adams's impairments meet the first part of the pain standard. (Doc. 6-3, p. 32) ("[T]he undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]"). However, the ALJ found that Ms. Adams's subjective complaints were only partially credible. (Doc. 6-3, p. 32) ("[T]he claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ."). Specifically, the ALJ found that Ms. Adams's description of her symptoms was inconsistent with her routine mental health treatment and her daily activities. (Doc. 6-3, pp. 32-33). The ALJ also discussed Ms. Adams's substitute teaching earnings within the disability period. (Doc. 6-3, pp. 22-23). The Court examines each category of evidence in turn.

1.    *Routine and Conservative Treatment*

The ALJ found that Ms. Adams's routine and conservative treatment conflicted with her description of her symptoms. This is an appropriate basis for discrediting a claimant's subjective testimony. *See Wolfe v. Chater*, 86 F.3d 1072,

1078 (11th Cir. 1996) (recognizing that a physician's conservative medical treatment for a particular condition may negate a claim of disability).

Most of the medical evidence in the record predates Ms. Adams's alleged onset date of September 17, 2013. (Doc. 6-9, pp. 5-65; Doc. 6-10, pp. 2-86; Doc. 6-11, pp. 3-18, 25-45). October 2009 is the earliest documentation of Ms. Adams's struggle with OCD. (Doc. 6-10, p. 71).[1] Ms. Adams attended several therapy sessions at Southeastern Psychiatric Management in 2010. (Doc. 6-10, pp. 68-69). Ms. Adams testified that she stopped this treatment because she owed money to Mountain View Hospital. (Doc. 6-3, p. 62).[2]

Between 2010 and 2015, Ms. Adams's primary care physician, Dr. Sanders, treated Ms. Adams's OCD, ADD, and depression with medication, prescribing Fluvoxamine for OCD, Vyvanse for ADD, and Citalopram for depression. (Doc. 6-7, p. 78). But in records from 16 appointments between 2013 and 2015, Dr. Sanders did not identify OCD, face picking, ADD, or depression as the basis for Ms. Adams's visit. (Doc. 6-11, pp. 50-57, 72-81). Instead, Dr. Sanders listed

---

[1] Ms. Adams states in her brief that her 2008 emergency room visit is the earliest example of her mental health impairments. (Doc. 9, p. 8). The record shows that Ms. Adams went to the emergency room on this occasion for hypertension rather than mental health issues. (Doc. 6-11, p. 30).

[2] Mountain View is a psychiatric hospital. Southeastern Psychiatric Management operates Mountain View and several outpatient clinics. *See* http://www.mtnviewhospital.com/about-us/ (last visited November 26, 2018).

other conditions such as low back pain (Doc. 6-11, p. 57), sore throat (Doc. 6-11, p. 53), and congestion. (Doc. 6-11, p. 73).

The record indicates that most of Ms. Adams's appointments with Dr. Sanders were checkups or visits for medication refills. (Doc. 6-11, pp. 50-52, 56, 75, 78-79, 81). Ms. Adams did not seek hospitalization for psychiatric treatment during the disability period; her only visit to the emergency room was for abdominal pain in 2016. (Doc. 6-11, p. 83).

In several medical records from the 2013 and 2015 time period, Dr. Sanders referenced Ms. Adams's OCD. (Doc. 6-11, pp. 51, 56, 78-79, 81). Generally, Dr. Sanders noted the condition either under the "medical diagnosis" or "history of present illness" sections of the records. (Doc. 6-11, pp. 51, 56, 78-79, 81). *See Crow v. Comm'r, Soc. Sec. Admin.*, 571 Fed. Appx. 802, 806-07 (11th Cir. 2014) (ALJ properly cited claimant's "infrequent treatment history, largely built around diagnosis and prescription management" in reaching a negative credibility assessment).

Dr. Sanders mentions Ms. Adams's compulsive face-picking in notes from a March 24, 2015 appointment. (Doc. 6-11, p. 78). This isolated notation, without more, does not substantiate the severity of Ms. Adams's OCD during the disability period. *Cf. Castle v. Colvin*, 557 Fed. Appx. 849, 853 (11th Cir. 2014) ("During

the relevant time period between January of 2008 and March of 2009, Mr. Castle did not once visit a physician for his alleged knee pain.").

The record also indicates that Ms. Adams's ADD and depression improved with the use of medication prescribed by Dr. Sanders. (Doc. 6-11, p. 62) ("The use of [Vyvanse] has substantially improved her concentration and attention span .... The patient is responding well to the use of Celexa on a daily basis.").[3] The ALJ could rely upon Ms. Adams's history of routine medical treatment during the disability period as a basis for discounting her allegations of disabling mental impairments. *See Sheldon v. Astrue*, No. 07-12677, 2008 WL 624748, at *1 (11th Cir. Mar. 10, 2008) ("A doctor's conservative medical treatment for a particular impairment tends to negate a claim of disability.").

Dr. Sanders changed Ms. Adams's prescribed medication when she reported that she was seeing no difference in her mental status with the prescribed treatment. (*See* Doc. 6-3, p. 65) ("I really couldn't see, see any difference [when taking Citalopram] and [Dr. Sanders] . . . has me on Zoloft now."); (Doc. 6-11, p. 78) (notations from March 2015 indicating that Dr. Sanders discussed whether Ms. Adams should start taking Zoloft). This evidence suggests that Dr. Sanders would

---

[3] Merriam-Webster's Medical Dictionary notes that "Citalopram is marketed under the trademark Celexa" and is used to treat "depression and anxiety." *Citalopram*, MERRIAM-WEBSTER ONLINE MEDICAL DICTIONARY. https://www.merriam-webster.com/medical/citalopram (last visited July 25, 2018).

have been willing to prescribe more aggressive treatment for Ms. Adams if she had reported a decline in her mental health status to him during the disability period.

Dr. Sanders consistently treated Ms. Adams's OCD with Fluvoxamine both before (Doc. 6-11, p. 56) and after (Doc. 6-7, p. 78) her alleged disability onset date. *Cf.* SSR 16-3p, 2016 WL 1119029, at *8 ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."). Although Dr. Sanders referred Ms. Adams to Mountain View for mental health treatment in 2009 (Doc. 6-3, p. 65; Doc. 6-10, p. 71), Dr. Sanders did not make similar referrals following Ms. Adams's 2013 onset date. (Doc. 6-11, pp. 50-57, 72-81).

Ms. Adams maintains that the ALJ erred in relying on her conservative mental health treatment because the ALJ did not consider her inability to afford additional treatment. (Doc. 9, p. 10). An ALJ must consider evidence indicating that a claimant cannot afford medical care before discounting credibility based upon failure to pursue or comply with treatment. *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (poverty may excuse noncompliance). Ms. Adams testified that she could not continue therapy at Mountain View because she owed money for treatment in 2010. (Doc. 6-3, p. 62).

Ms. Adams did not testify that her debt carried forward through the disability period. Instead, Ms. Adams testified that she was insured through June 2014. (Doc. 6-3, p. 54). The record indicates that Ms. Adams was able to afford medical treatment with Dr. Sanders between July 2014 and December 2015. (Doc. 6-11, pp. 50-57, 72-81). Therefore, the ALJ did not commit reversible error because the record contains no evidence that suggests that Ms. Adams was unable to pay for treatment during her claimed disability period.

Therefore, substantial evidence supports the ALJ's credibility finding based on Ms. Adams's treatment records. *See Busby v. Colvin*, No. CA 13-0120-C, 2013 WL 6158110, at *9 (S.D. Ala. Nov. 25, 2013) (finding an ALJ's negative credibility finding appropriate when, "[d]espite generally having access to treatment, the claimant's prescribed treatment has remained unchanged. There are no records of significant adjustments in treatment or an aggressive course of care.").

### 2.    *Daily Activities*

In evaluating Ms. Adams's credibility, the ALJ also considered Ms. Atkins's daily activities, specifically her "ability to care for her two minor nieces . . . ." (Doc.  6-3, p. 33).  The ALJ may consider a claimant's daily activities when making a credibility finding.  *See* 20 C.F.R. §§ 404.1529(c)(3) (listing "daily activities" as a relevant factor to consider in evaluating a claimant's subjective

pain testimony).   When examining daily activities, an ALJ must consider the record as a whole.  *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (faulting the Appeals Council's finding that claimant's "daily activities . . . have not been significantly affected" when the Appeals Council "ignored other evidence that her daily activities have been significant affected").  The Eleventh Circuit has recognized that "participation in everyday activities of short duration" will not prevent a claimant from proving disability.  *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).  Instead, "[i]t is the ability to engage in gainful employment that is the key, not whether a Plaintiff can perform chores or drive short distances." *Early v. Astrue*, 481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007); *see Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (claimant who "read[s], watch[es] television, embroider[s], attend[s] church, and drive[s] an automobile short distances . . . . performs housework for herself and her husband, and accomplishes other light duties in the home" still can suffer from a severe impairment).

Ms. Adams and her husband have been raising their three great-nieces for approximately 13 years.  (Doc. 6-3, p. 48).  Ms. Adams and her husband care for the two youngest girls, ages 14 and 17, who live with them.  (Doc. 6-3, pp. 48-49; Doc. 6-7, p. 57).[4]   Each morning, Ms. Adams "wakes the girls for school and

---

[4] Ms. Adams indicated in her disability application that her sister also lives with her and helps to care for the girls.  (Doc. 6-7, p. 57).  Ms. Adams testified during the administrative hearing that her sister no longer lives with her.  (Doc. 6-3, p. 59).

makes sure they catch the bus . . . ."  (Doc. 6-7, p. 47).  She also occasionally shops for the girls' clothes and shoes, in addition to groceries for the household.  (Doc. 6-7, p. 59).  Additionally, she helps the "girls with homework and makes sure they get baths . . . ."  (Doc. 6-7, p. 54).  In her administrative hearing, Ms. Adams indicated that she "took [the 17-year-old niece] to visit with her mother in Georgia . . . ."  (Doc. 6-3, p. 49).

Collectively, these care-giving activities undermine the credibility of Ms. Adams's subjective complaints of disabling conditions.  Ms. Adams's other reported daily activities also diminish the credibility of her allegations.  Ms. Adams fixes simple meals for herself every day.  (Doc. 6-7, p. 58).  She does laundry once weekly and cuts the grass using a riding lawnmower.  (Doc. 6-7, p. 58).  Although Ms. Adams is "always late" when she attends social activities (Doc. 6-7, p. 61), she attends church approximately twice each month.  (Doc. 6-7, p. 60).  She reports being late with her bank payments many times as a result of her obsessive impulse to procrastinate.  (Doc. 6-7, pp. 59-60).  However, she has adapted to this limitation by making payments over the phone and internet.  (Doc. 6-7, p. 59).

Dr. Bentley considered Ms. Adams's daily activities as part of his consultative examination on July 17, 2014.  (Doc. 6-11, pp. 63-64).  After that

visit, Dr. Bentley reported that Ms. Adams "completes her ADLs without assistance." (Doc. 6-11, p. 64).

Consequently, the ALJ could rely upon daily activity evidence when partially discounting the severity of Ms. Adams's alleged disabling symptoms. *See Kirby v. Astrue*, No. 5:12-CV- 01145-KOB, 2013 WL 5355054, at *23 (N.D. Ala. Sept. 24, 2013) ("Considering that the claimant attends school functions, prepares simple meals, cares for his children, drives, shops, . . . and attends church, the ALJ found that the claimant was limited but able to perform at least some type of work activity.").

### 3. *Part-Time Work Activities*

The ALJ discussed Ms. Adams's part-time work in his decision (Doc. 6-3, pp. 22-23), but did not expressly rely on it to support his pain standard determination. That evidence also diminishes the credibility of Ms. Adams's characterization of her OCD.

Although Ms. Adams alleges that her disability began on September 17, 2013 (Doc. 6-6, p. 2), she worked as a substitute teacher with the Attalla school system through 2014. (*See* Doc. 6-7, p. 30 (indicating that Ms. Adams worked the months of September through December 2013 as well as January through March of 2014)). Ms. Adams stated in her disability application that she stopped working entirely as a teacher on March 31, 2014, after being fired for failing to arrive on

time. (*See* Doc. 6-7, pp. 40, 62). Elsewhere in her application, Ms. Adams indicated that she still served as a substitute teacher occasionally. (*See* Doc. 6-7, p. 56 (stating "I have no regular work schedule and only substitute teach (now only very rarely") (emphasis omitted)).

Other records suggest that Ms. Adams did not completely stop teaching after March 31, 2014. Dr. Bentley indicated in his consultative report that Ms. Adams worked "periodically as a substitute teacher one to two days each week." (Doc. 6-11, p. 63). Likewise, Dr. Robertson indicated in notes from a July 25, 2014 examination that Ms. Adams was not working because it was summer break. (*See* Doc. 6-11, p. 67) ("She currently works as a substitute teacher but has been off for the summer.")). In her disability application, Ms. Adams stated that she stopped working both "[b]ecause of my condition(s)" and "[b]ecause of other reasons." (Doc. 6-7, p. 40).

As a substitute teacher during the 2013 and 2014 school years, Ms. Adams worked an average of three days per month. (Doc. 6-7, p. 34). Her duties as a substitute teacher included taking the roll, giving assignments left by the teacher, and supervising 20-30 high school or middle school students. (Doc. 6-7, p. 67). Although Ms. Adams's part-time work during 2013 and 2014 does not qualify as substantial gainful employment (Doc. 6-3, p. 22), her ability to continue teaching following her alleged disability onset date buttresses the ALJ's decision to discount

her testimony concerning the severity of her disabling symptoms. *See Dillard v. Astrue*, 834 F. Supp. 2d 1325, 1329 (M.D. Ala. 2011) ("[T]he record reflects work activity after the alleged onset date. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported."); *Pitts v. Colvin*, No. 4:11-CV-3229-LSC, 2013 WL 1282062, at *7 (N.D. Ala. March 21, 2013) ("She also worked part-time after the alleged onset date of disability. While this work did not rise to the level of substantial gainful activity, it does diminish the credibility of Ms. Pitts's allegations of disabling side effects from medications.") (internal citations and quotation marks omitted).

B. **The ALJ properly evaluated the medical opinion evidence**.

The ALJ relied upon the opinions of state agency case reviewer Dr. Sims and consultative examiner Dr. Bentley when determining Ms. Adams's residual functional capacity. (Doc. 6-3, p. 32). Ms. Adams argues that the ALJ's reliance upon these doctors' opinions was improper. (Doc. 9, p. 7).

An ALJ must consider every medical opinion in the administrative record. *See* 20 C.F.R. § 404.1527(c) (stating that "[r]egardless of its source, we will evaluate every medical opinion we receive"). An "ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion." *McCloud v.*

*Barnhart*, 166 Fed. Appx. 410, 418 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)). "Absent 'good cause,' an ALJ is to give the medical opinions of treating physicians 'substantial or considerable weight.'" *Winschel*, 631 F.3d at 1179 (quoting *Lewis*, 125 F.3d at 1440). "The opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as . . . the consistency of the opinion with the record as a whole, including other medical opinions . . . ." SSR 96-6p, 1996 WL 374180, at *2.[5]

However, SSR 96-6p also provides that:

> [i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source[']s medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

SSR 96-6p, 1996 WL 374180, at *3.

---

[5] For claims filed on or before March 27, 2017, the rules in 20 C.F.R. § 404.1527 apply. For claims filed after March 27, 2017, the rules contained in 20 C.F.R. § 404.1520 will apply. Because Ms. Adams applied for disability in June of 2014, 20 C.F.R. §§ 404.1527 governs here. (Doc. 6-6, p. 2).

Although an opinion from Ms. Adams's treating physician, Dr. Sanders, is entitled to deference under 20 C.F.R. § 404.1527(c)(2) and the authorities discussed above, the Court has not located a vocationally-based opinion within Dr. Sanders's treatment notes during the disability period (Doc. 6-11, pp. 50-57, 72-81) or elsewhere within the record. Ms. Adams has not cited an opinion from Dr. Sanders within the disability period that supports her claim.

Without an opinion from Dr. Sanders about Ms. Adams's ability to work given her mental impairments, the ALJ properly relied upon other opinion evidence. *See Anderson v. Colvin*, No. 5:15-cv-836-TMP, 2017 WL 2212779, at *6 (N.D. Ala. May 19, 2017) ("The ALJ did not err in giving the non-treating physician's opinion partial weight where she did not have under submission any contrary evidence from any treating physicians.").

The ALJ relied upon the opinions of Drs. Sims and Bentley in part because both specialize in mental health. (*See* Doc. 6-4, p. 27 (indicating "Peter M. Sims, MD – Psychiatry")); (Doc. 6-11, p. 64 (indicating "Jack L. Bentley, Jr., Ph.D., LPC")); s*ee also* 20 C.F.R. 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). The ALJ expressly made this point about Dr. Sims when assigning weight. (*See* Doc. 6-3, p. 32 ("Dr. Sims is a psychiatrist and, thus, this is his specialty.")). The ALJ

pointed out Dr. Sims's familiarity with the Social Security Administration disability program as another reason to credit his (Dr. Sims) findings. (Doc. 6-3, p. 32); *see also* SSR 96-6p, 1996 WL 374180, at *2 ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act.").

The ALJ found "Dr. Sims'[s] conclusions to be especially persuasive." (Doc. 6-3, p. 32). Ms. Adams maintains that Dr. Sims's opinion is due little weight because Dr. Sims did not examine her, and his opinion is contrary to the medical record. (Doc. 9, p. 7). Typically, an ALJ should give more weight to an opinion from an examining physician than to an opinion from a non-examining physician. *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985). "Where, however, a non-examining physician's assessment does not contradict the examining physician's report, the ALJ does not err in relying on the non-examining physician's report." *Poellnitz v. Astrue*, 349 Fed. Appx. 500, 502 (11th Cir. 2009) (citing *Edwards v. Sullivan*, 937 F.2d 580, 584-85 (11th Cir. 1991)).

Ms. Adams does not explain how Dr. Sims's opinion contradicts Dr. Bentley's opinion or other record evidence. Dr. Sims assessed Ms. Adams's mental functioning in July 2014 and rated it as moderately, but not markedly, severe. (Doc. 6-4, p. 24). In drawing that conclusion, Dr. Sims relied on Dr.

Bentley's report and assigned it "some weight." (Doc. 6-4, p. 28). Dr. Sims also indicated that no other medical source provided an opinion containing vocational limitations for Ms. Adams greater than his findings. (Doc. 6-4, p. 30).

The Court has reviewed Dr. Bentley's report (Doc. 6-11, pp. 62-64) and finds overlap with Dr. Sims's findings. During Dr. Bentley's consultative examination, Ms. Adams arrived on time, displayed intact memory, and exhibited no limitations in her communication skills. (Doc. 6-11, p. 63). Dr. Bentley reported "some stability in [Ms. Adams's] psychiatric symptoms as a result of being medicated for ADHD" and that "[t]he prognosis for her current level of functioning is considered favorable." (Doc. 6-11, p. 64).

Dr. Bentley cautioned that Ms. Adams "would have a moderate to marked limitation in her ability to sustain complex or repetitive work-related activities" and "could be expected to perform at a diminished pace when attempting these activities." (Doc. 6-11, p. 64). However, Dr. Bentley also indicated that Ms. Adams "would certainly seem capable of sustaining work-related activities of a non-stressful nature" and "would have little difficulty communicating effectively with co-workers and supervisors." (Doc. 6-11, p. 64).

Ms. Adams disputes this finding, but she relies mostly upon the description of her mental health status in 2009 and 2010, a time frame that precedes her onset date in 2013. (Doc. 9, pp. 8-9). Ms. Adams refers to Dr. Sanders's treatment of

her ADD and OCD during the disability period (Doc. 9, p. 9) but, as discussed above, those treatment records indicate that Ms. Atkins's mental health stabilized during the disability period.

Dr. Bentley's findings support Dr. Sims's conclusions that Ms. Adams "will be able to carry out simple, work-related tasks" and that she does not have "marked and severe impairment in the area of interacting with and relating to others." (Doc. 6-4, p. 29). Because Dr. Sims's opinion overlaps with Dr. Bentley's, the ALJ properly relied upon it. *Poellnitz*, 349 Fed. Appx. at 502 (citing *Edwards*, 937 F.2d at 584-85)).

The ALJ found that Dr. Sims's vocational assessment of Ms. Adams was consistent with the record as a whole. (Doc. 6-3, p. 33). As discussed above, Ms. Adams's treatment following her alleged disability onset date consists largely of routine office visits for medication. (Doc. 6-11, pp. 50-52, 66, 75, 78-79, 81). The ALJ did not commit reversible error in concluding that the pattern of routine treatment during the disability period was "[in]consistent with [Ms. Adams's] allegations of disabling mental impairments" and supported Dr. Sims's assessment of her mental residual functioning. (Doc. 6-3, p. 33); *cf. also* SSR 16-3p, 2016 WL 1119029, at *8 (stating that "if the frequency or extent of treatment sought by an individual is not comparable with the degree of the individual's subjective

complaints . . . we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of the record").

The ALJ's reasons for relying upon Dr. Sims's opinion (as supported by Dr. Bentley's report) are "explicit, adequate, and supported by substantial evidence in the record." *Wainwright v. Comm'r of Soc. Sec.*, No. 06-15638, 2007 WL 708971, at *2 (11th Cir. March 9, 2007) (substantial evidence supported ALJ's decision to accept opinion of state agency psychologist when the ALJ stated with particularity the reasons for doing so). Therefore, substantial evidence supports the ALJ's evaluation of the medical opinion evidence regarding Ms. Adams's residual functional capacity.

## V.    CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards. The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner's decision. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** this 15th day of January, 2019.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE